# In the United States Court of Federal Claims
BID PROTEST

|  |  |
|---|---|
| HARMONIA HOLDINGS GROUP, LLC, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> THE UNITED STATES OF AMERICA, ) <br> ) <br> Defendant. ) <br> ) | No. 21-836C <br> (Filed Under Seal: March 19, 2021 \| <br> Reissued: April 5, 2021)* |

*Jon D. Levin*, *W. Brad English*, *Emily J. Chancey*, and *Michael W. Rich*, Maynard, Cooper & Gale, P.C., Huntsville, AL, for Plaintiff.

*Jimmy S. McBirney*, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for Defendant, with whom were *Misha Preheim*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, and *Brian M. Boynton*, Acting Assistant Attorney General. *Tyler Ellis*, General Law & Research Division, Office of the General Counsel, U.S. Department of Agriculture, Washington, DC, Of Counsel.

## OPINION AND ORDER

**KAPLAN, Chief Judge.**

In this post-award bid protest, Harmonia Holdings Group, LLC ("Harmonia"), challenges the decision of the United States Department of Agriculture ("USDA" or the "agency") to award Digital Management, LLC ("DMI") a contract for operations and maintenance support services and help desk support for certain IT systems. Harmonia contends that the award should be set aside because the agency: 1) relied on criteria not contained in the Solicitation when it evaluated and compared the past performance of Harmonia and DMI; 2) assigned Harmonia an unjustified weakness for failing to provide assurances that personnel working for the incumbent contractor (DMI) would agree to join a new Harmonia team; and 3) arbitrarily failed to assign Harmonia strengths in recognition of certain technologies and processes contained in its proposal. Harmonia also argues that the award should be set aside because the Source Selection Authority failed to exercise independent judgment or adequately document the rationale of her trade-off decision.

---

* This opinion was originally issued under seal and the parties were given the opportunity to request redactions. The parties have not proposed any redactions. Therefore, the Court releases the opinion in full.

Currently before the Court are the parties' cross-motions for judgment on the administrative record. Pl. Harmonia Holdings Grp., LLC's Mot. for J. on the Admin. R. ("Pl.'s MJAR") at 1, ECF No. 21; Def.'s Resp. to Pl.'s Mot. for J. on the Admin. R. and Cross-Mot. for J. on the Admin. R. at 1, ECF No. 22. For the reasons set forth below, Harmonia has failed to establish that USDA's decision was arbitrary, capricious, an abuse of discretion, or contrary to law. Therefore, the government's motion for judgment on the administrative record is granted, and Harmonia's motion is denied.

## BACKGROUND

### I. Market News

Market News is a service through which USDA's Agricultural Marketing Service ("AMS") makes available current market information about more than 3,600 commodities at the international, national, regional, and local levels. Admin. R. ("AR") Tab 4 at 76. Its "core mission . . . is to collect commodity price and volume data from a variety of open and confidential sources, and then provide unbiased market reporting to the public." AR Tab 1 at 4.

Market News Reports are disseminated free of charge via an internet web site, newspapers, and radio, and are also available by email. Id. at 5. There are about 375 different formatted reports that are issued through Market News on either a daily, weekly, monthly, or annual basis. Id. In addition, users may obtain "a nearly unlimited number of customized reports" from the Market News Portal. Id. Farmers, producers, and other agricultural businesses use the information Market News supplies "to evaluate market conditions, identify trends, make purchasing decisions, monitor price patterns, evaluate transportation equipment needs, and accurately assess movement." AR Tab 4 at 76.

USDA relies on two systems to gather and analyze the information Market News disseminates. The first—the Livestock Mandatory Reporting System ("LMPRS")—is a data-collection and data-reporting system originally developed in 2001 in response to the Livestock Mandatory Reporting Act of 1999, Pub. L. No. 106-78, 113 Stat. 1188 (1999) and then updated after the passage of the Mandatory Price Reporting Act of 2010, Pub. L. No. 111-239, 124 Stat. 2501 (2010). Id. at 76–77. LMPRS electronically accepts data from the livestock and dairy industries and archives, translates, and analyzes the data, then produces and stores aggregated data and creates aggregated public reports. Id. at 76.

Market News also employs USDA's Market Analysis and Reporting Services ("MARS"). MARS is an information management system that collects, analyzes, reports, and disseminates data related to all commodities and supply chain levels via the public website My Market News (https://mymarketnews.ams.usda.gov/). Id. at 77.

### II. The Solicitation

On April 14, 2020, AMS issued Solicitation No. 12639520Q0130 (the "Solicitation"). Id. at 71. In it, the agency invited proposals for support service contracts to maintain the continued, uninterrupted operations of the LMPRS and MARS by monitoring system performance, providing help desk support, maintaining system documentation, providing information

technology support, and creating system enhancements. Id. at 76. The contract was a firm fixed priced contract for one base year and four option years. Id.

The Solicitation advised that the LMPRS must "be operational and available" for as close to 24 hours per day, 365 days per year, as possible. Id. at 131. To that end, it specified that the government might assess financial penalties under the contract in the event of "any interruption of service with a root cause within the LMPRS applications that lasts more than thirty minutes between 7:00AM and 8:00PM eastern time." Id. at 78. A similar penalty could be imposed under the contract for service interruptions with their root cause in the MARS application that last more than sixty minutes during the same thirteen-hour period. Id.

The Solicitation provided that the agency would evaluate offers using a best-value tradeoff based on consideration of four factors: 1) technical capability; 2) relevant experience; 3) past performance; and 4) price. Id. at 134. It further stated that "Technical Capability, Relevant Experience, and Past Performance are significantly more important than price." Id. The Solicitation advised that the agency would make its best-value determination "by comparing the value of the differences in the technical factors for competing offers, based on their strengths, weaknesses, and risks, with differences in their price to the Government" and that, "[i]n making this comparison, the Government is more concerned with obtaining superior technical and management capabilities than with making an award on lowest overall cost to the Government." Id. at 136.

### III.  Evaluation and Award Decision

#### A.  The Proposals, Requests for Clarification, and Final Proposal Revisions

The agency received a total of nine proposals in response to the Solicitation. AR Tab 19 at 862. Harmonia submitted its proposal on June 4, 2020. AR Tab 10a at 442. The agency eliminated one of the nine proposals at the outset and evaluated the remaining eight. AR Tab 19 at 862.

USDA commenced evaluation of the proposals in July. On July 14, 2020, the Technical Evaluation Panel ("TEP"), in consultation with the AMS Contracting Officer ("CO") serving as the Source Selection Authority ("SSA"), decided to perform a "down selection" and not give further consideration to six of the offerors, leaving only Harmonia and DMI in the competition. Id. at 862, 867–68.

On September 16, 2020, USDA requested clarification of Harmonia's cost proposal. AR Tab 11 at 518–20. Among other things, USDA expressed concerns about the fact that Harmonia had proposed to use only 7.1 full time equivalents on the contract, including only five employees working full-time, which was less than the staffing of technical support for LMPRS and MARS under USDA's existing contract with DMI. See id. at 519–20. Harmonia responded to USDA's request by letter of September 25, 2020, explaining its rationale regarding staffing. AR Tab 12 at 521–24.

On October 23, 2020, USDA requested that Harmonia and DMI submit final proposal revisions by October 30, 2020. AR Tabs 13 & 14. DMI and Harmonia did so on October 29 and 30, 2020, respectively. AR Tabs 15 & 16.

### B.     The Evaluations

Over the next few months after the submission of final proposal revisions, the TEP and the SSA met several times as the TEP prepared and revised its evaluation of the final proposals. AR Tab 19 at 862–63. On January 14, 2021, the TEP provided its final Technical Evaluation Report (the "Report") to the SSA. AR Tab 18 at 838–60. The Report summarized the "strengths" and "weaknesses/risks" of the proposals with respect to each of the four factors set forth in the Solicitation. Id. at 841–53.[1] It also assigned scores to each proposal as to the non-price factors based on the sets of criteria contained in the Technical Evaluation Plan.

Under the Technical Capability factor, the Report recorded that Harmonia's proposal had been assigned a strength because it was "[e]xcellent overall," and had "little or no material weaknesses." AR Tab 18 at 850. As relevant to this case, the TEP identified one weakness/risk under the Technical Capability factor, namely, that Harmonia provided "no assurances that 'incumbents' w[ould] join [the] new Harmonia team." Id. The TEP explained that the lack of assurances created a risk that "historical ten years of knowledge w[ould] be lost." Id.

Under the Relevant Experience factor, the TEP again found Harmonia's proposal "[e]xcellent overall," and noted no weaknesses/risks. Id. Similarly, under the Past Performance factor, the TEP observed that Harmonia's "[p]roposal [wa]s well-put together, comprehensive, and the key personnel are well-qualified, with relevant experience that lists large contracts with USDA and other federal entities." Id.

Nonetheless, and also as relevant to this case, the TEP identified a weakness with respect to one of the criteria the agency used to evaluate offerors' past performance, namely, Criterion P5. That criterion concerned whether the past performance example demonstrated that the contractor was "familiar" or "had experience with AMS Market News strategic and business objective[s] along with an understanding [of] data collection and reporting requirements." AR Tab 18 at 856. The weakness assigned was based on "the lack [of] depth of" Harmonia's "Market News business experience." Id. The TEP observed that "[e]ach Market News program has unique business rules and reporting requirements," and that the incumbent, i.e., DMI, "has over ten years of understanding those details" whereas Harmonia "ha[d] none." Id.

The TEP acknowledged a strength in Harmonia's cost proposal, noting that it was "extremely competitive" and that initial costs were the lowest among all proposals. Id. It also identified a weakness based on the TEP's "concerns in the staffing plan on the original submission." Id. Although the final proposal revision addressed "some" of those concerns, according to the TEP Report, "the Release Manager still [was] low on hours and [therefore was] a concern/risk." Id.

---

[1] Under the Technical Evaluation Plan, "[a] strength is defined as an aspect of the proposal that increases the likelihood of successful contract performance." AR Tab 3 at 15. "A weakness is defined as a flaw in the proposal that increases the risk of unsuccessful contract performance." Id. at 16.

4

The TEP assigned a number of strengths to DMI's proposal as to all four factors. Id. at 842–45. No weaknesses/risks were identified for any of the three non-price factors. Id.

The Report includes a score sheet reflecting the assignment of points under each of the non-price factors. Id. at 854–56. The point scores were based on the adjectival ratings each TEP member assigned when evaluating the series of criteria established for each non-price factor. AR Tab 19 at 866.

Under the Technical Capability factor and the Relevant Experience factor, an Excellent rating assigned to one of the criteria was scored as 4 points, a Good rating 3 points, an Acceptable rating 2 points, a Marginal rating 1 point, and an Unacceptable rating 0 points. AR Tab 19 at 866. For Past Performance, the TEP evaluators examined each of the five criteria and assigned adjectival ratings of either Substantial Confidence (4 points), Satisfactory Confidence (3 points), Limited Confidence (2 points), or No Confidence (1 point). AR Tab 17a at 720; AR Tab 19 at 866. The agency then compiled the aggregate score of all five TEP evaluators into a final score for each of the three non-price factors, totaled the scores for all factors, and used that total score to rank the offerors. See AR Tab 19 at 866.

As reflected in the table below, under the Technical Capability factor, DMI had a total score of 128, and Harmonia 127. AR Tab 18 at 858. Under Relevant Experience, the aggregated TEP score for DMI was 111, and for Harmonia was 114. Id. For Past Performance, the aggregated score for DMI was 93, and for Harmonia was 83. Id. DMI had a total numerical score of 332, and Harmonia's was 324. Id.

| Criteria | Digital Management | Harmonia |
|---|---|---|
| **Technical Capability Rating** | | |
| T1 | 20 | 20 |
| T2 | 17 | 16 |
| T3 | 18 | 18 |
| T4 | 18 | 18 |
| T5 | 17 | 20 |
| T6 | 19 | 18 |
| T7 | 19 | 17 |
| Factor Total | 128 | 127 |
| **Relevant Experience Ratings** | | |
| E1 | 18 | 19 |
| E2 | 20 | 19 |
| E3 | 18 | 20 |
| E4 | 18 | 19 |
| E5 | 18 | 19 |
| E6 | 19 | 18 |
| Factor Total | 111 | 114 |
| **Past Performance Ratings** | | |
| P1 | 18 | 19 |
| P2 | 17 | 18 |
| P3 | 18 | 18 |

| | | |
|---|---|---|
| P4 | 20 | 19 |
| P5 | 20 | 9 |
| Factor Total | 93 | 83 |
| | | |
| Overall Total | 332 | 324 |
| Rank | 1 | 2 |

Id.

The evaluators noted the wide gap between the scores of DMI (which was ranked at 1) and Harmonia (ranked at 2) as compared to the third-ranked proposal (which was more than 60 points below Harmonia's rating). Id. The TEP found both Harmonia and DMI's proposals "of high quality with no significant defects." Id. The final cost of DMI's proposal was $5,616,297.10 and the final cost of Harmonia's proposal was $5,001,446.74. Id. at 859.

The TEP recommended that USDA award the contract to DMI. Id. at 859. It reasoned that Harmonia's "lack of any proven and established Market News experience was an enormous risk factor for the TEP," especially "given its two congressional mandates and its potential large economic impact at a national level for pricing market commodities." Id. at 859. The TEP observed that "[i]t is imperative that these systems be online, operational, and available for the public to access and share in price discovery, market transparency and fair market pricing economics." Id.

Further, the TEP explained, it viewed the proposed labor hours for the Release Manager in Harmonia's staffing plan as "inadequate to cover the known [operations and maintenance] duties of the MARS system." Id. "The MARS system," the TEP noted, "continues to grow," making the projected staffing estimate for a part-time Release Manager "a negative risk factor." Id.

Addressing best value, the TEP noted that "retaining the crucial skillsets & historical knowledge of the DMI team was worth the modest premium in cost over the five years of the new contract." Id. DMI, it emphasized, had "existing historical knowledge of Market News" and a "proven track record of delivery with AMS Market News." Id. The TEP concluded that "to replace that historical knowledge would be extremely difficult, time consuming, disruptive, and have substantial long-term cost impacts to AMS far beyond the modest premium paid in DMI's cost proposal." Id.

> C.  **The Source Selection Authority's Best Value Determination**

The TEP forwarded its findings and recommendation to the SSA. AR Tab 19 at 867, 885. The SSA ultimately concluded that DMI's proposal was "the best value to the Government" based on DMI's strengths including: its past decade of experience developing, maintaining, and improving LMPRS and MARS, its current plans for maintaining and improving both systems, and its institutional knowledge and experienced staff. Id. at 882–85. "DMI's proposal," she found, "provided a complete plan" that demonstrated to the SSA "that DMI would pose a very low to limited amount of risk to this contract proposal." Id. at 885. She concluded DMI's price was fair and reasonable. Id.

Although Harmonia had "experience with USDA," the SSA observed, it did not have experience with AMS or Market News. Id. DMI, on the other hand, proposed using the "same key personnel," who would not have a "learning curve to overcome," unlike Harmonia's personnel who would have "to become familiar with the LMPRS and MARS environment and functionality." Id. Additionally, DMI's proposal was the highest technically ranked and posed less risk to the government than Harmonia's because of its decade of institutional knowledge, key personnel, and "established development environments for LMPRS and MARS." Id. Despite the fact that "Harmonia's proposal was very good and [its] price was approximately 11% lower than DMI's," the SSA stated that, in her view, DMI's proposal provided the best value to the government. Id.

On January 20, 2021, USDA awarded the contract to DMI. AR Tab 20 at 886.

### IV. This Action

Harmonia brought suit in this Court on February 1, 2021. ECF No. 1. On the same day, Harmonia filed a motion for a preliminary injunction. ECF No. 3. The Court established an expedited briefing schedule on the parties' cross-motions for judgment on the administrative record and denied Harmonia's motion for a preliminary injunction as moot. ECF No. 17. The government filed the Administrative Record on February 19, 2021. ECF No. 19. Harmonia filed an amended complaint on February 26, ECF No. 20, as well as its motion for judgment on the administrative record ("MJAR"), ECF No. 21. The government filed its cross-MJAR and response to Harmonia's MJAR on March 5. ECF No. 22. Harmonia filed its response to the government's MJAR and reply in support of its own MJAR on March 11. ECF No. 23. The government filed its reply on March 16. ECF No. 24.

The Court heard oral argument on the cross-MJARS on March 18.

## DISCUSSION

### I. Subject-Matter Jurisdiction

The Court of Federal Claims has jurisdiction over bid protests in accordance with the Tucker Act, 28 U.S.C. § 1491(b)(1). Specifically, the Court has the authority "to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1); see also Sys. Application & Techs., Inc. v. United States, 691 F.3d 1374, 1380–81 (Fed. Cir. 2012) (observing that § 1491(b)(1) "grants jurisdiction over objections to a solicitation, objections to a proposed award, objections to an award, and objections related to a statutory or regulatory violation so long as these objections are in connection with a procurement or proposed procurement").

To possess standing to bring a bid protest under § 1491(b)(1), a plaintiff must be an "interested party," i.e., "an actual or prospective bidder" who possesses a "direct economic interest" in the procurement. CliniComp Int'l, Inc. v. United States, 904 F.3d 1353, 1358 (Fed. Cir. 2018) (quoting Digitalis Educ. Sols., Inc. v. United States, 664 F.3d 1380, 1384 (Fed. Cir. 2012)); see also Orion Tech., Inc. v. United States, 704 F.3d 1344, 1348 (Fed. Cir. 2013). "In a

post-award bid protest, the relevant inquiry is whether the bidder had a 'substantial chance' of winning the award. Eskridge & Assocs. v. United States, 955 F.3d 1339, 1345 (Fed. Cir. 2020) (quoting Statistica, Inc. v. Christopher, 102 F.3d 1577, 1582 (Fed. Cir. 1996)). The protestor must establish "not only some significant error in the procurement process, but also that there was a substantial chance it would have received the contract award but for that error." Id.

Harmonia's proposal had a lower price than DMI's. Its score on the three non-price factors was just below DMI's. But for what Harmonia alleges was the agency's impermissible reliance upon an unstated solicitation criterion, Harmonia's score on the three non-price factors would have been higher than DMI's. Because Harmonia would have had a substantial chance of receiving the award but for the errors it alleges the agency committed, Harmonia has standing to bring this protest.

## II.    Motions for Judgment on the Administrative Record

Parties may move for judgment on the administrative record pursuant to Rule 52.1 of the Rules of the Court of Federal Claims ("RCFC"). Pursuant to RCFC 52.1, the Court reviews an agency's procurement decision based on the administrative record. See Bannum, Inc. v. United States, 404 F.3d 1346, 1353–54 (Fed. Cir. 2005). The court makes "factual findings under RCFC [52.1] from the record evidence as if it were conducting a trial on the record." Id. at 1357. Thus, "resolution of a motion respecting the administrative record is akin to an expedited trial on the paper record, and the Court must make fact findings where necessary." Baird v. United States, 77 Fed. Cl. 114, 116 (2007). The Court's inquiry is "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." A&D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006). Unlike a summary judgment proceeding, genuine issues of material fact will not foreclose judgment on the administrative record. Bannum, 404 F.3d at 1356.

## III.   Scope of Review of Procurement Decisions

The Court reviews challenges to procurement decisions under the same standards used to evaluate agency actions under the Administrative Procedure Act, 5 U.S.C. § 706 ("APA"). See 28 U.S.C. § 1491(b)(4) (stating that "[i]n any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5"). Thus, to successfully challenge an agency's procurement decision, a plaintiff must show that the agency's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); see also Bannum, 404 F.3d at 1351.

"[P]rocurement decisions are subject to a 'highly deferential rational basis review.'" Safeguard Base Operations, LLC v. United States, No. 2019-2261, 2021 WL 821472, at *11 (Fed. Cir. Mar. 4, 2021) (quoting PAI Corp. v. United States, 614 F.3d 1347, 1351 (Fed. Cir. 2010)). The standard "requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974)). As a result, where an agency's action has a reasonable basis, the Court cannot substitute its judgment for that of the agency. See Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (holding that as long as there is "a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original

8

proposition, have reached a different conclusion") (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971)).

**IV.     Merits**

    **A.     Harmonia's Argument that the Agency Used Criteria Not Stated in the Solicitation When it Evaluated Harmonia's Past Performance**

Harmonia challenges the methodology the agency used to evaluate and score its past performance. It claims that one of the five criteria the agency employed under the Past Performance factor was not contained in the Solicitation. The criterion challenged—P5—evaluates the offeror's "[f]amiliar[ity] with or experience with AMS Market News strategic and business objectives along with [its] understanding [of] data collection and reporting requirements." AR Tab 18 at 856.

All five TEP evaluators gave DMI a "Substantial Confidence" rating for Criterion P5, resulting in a combined score for that criterion of 20 points. Id. Harmonia, on the other hand, received four "Neutral" ratings for Criterion P5 and one rating of "Limited Confidence," for a total score of 9. Id. In addition, the agency assigned a weakness/risk to Harmonia's proposal under the Past Performance factor based on a "[l]ack of Market News USDA experience." AR Tab 19 at 876. It is undisputed that had the agency not used Criterion P5 when it evaluated Harmonia's past performance, Harmonia's total score for the non-price evaluation factors would have been 315 and DMI's 312.

It is well established that an agency is required to evaluate proposals based only on the criteria stated in a solicitation. Summit Techs., LLC v. United States, 151 Fed. Cl. 171, 180–81 (2020) (citing Banknote Corp. of America v. United States, 56 Fed. Cl. 377, 386 (2003), aff'd, 365 F.3d 1345 (Fed. Cir. 2004)). "This requirement is firmly rooted in the Competition in Contracting Act (CICA), which indicates that an agency shall evaluate competitive proposals and assess their qualities based solely on the factors and subfactors specified in the solicitation." NEQ, LLC v. United States, 88 Fed. Cl. 38, 47–48 (2009) (citing 48 10 U.S.C. §§ 2305(a)(2)(A), 2305(a)(3)(A); 48 C.F.R. § 15.305(a)).

Nonetheless, it is equally well settled that the solicitation "need not identify criteria intrinsic to the stated evaluation factors, and agencies retain great discretion in determining the scope of a given evaluation factor." Summit Techs., 151 Fed. Cl. at 180 (quoting PlanetSpace, Inc. v. United States, 92 Fed. Cl. 520, 536 (2010)). Therefore, to prevail on an argument that the agency impermissibly employed an unstated evaluation criterion, a protester must show, at a minimum, that the agency "used a significantly different basis in evaluating the proposals than was disclosed." Wellpoint Military Care Corp. v. United States, 144 Fed. Cl. 392, 404 (2019), aff'd, 953 F.3d 1373 (Fed. Cir. 2020) (citing Academy Facilities Mgmt. v. United States, 87 Fed. Cl. 441, 470 (2009)).

Harmonia has not met this standard. Consideration of an offeror's familiarity or experience with "AMS Market News strategic and business objectives," as well as the offeror's "understanding [of its] data collection and reporting requirements" is intrinsic to the explicit Past Performance criteria set forth in the Solicitation. AR Tab 18 at 856. The Solicitation states that "[p]ast performance will be evaluated for contracts performed by the Offeror consistent with the

9

size, scope, and complexity of the [Performance Work Statement ("PWS")]." AR Tab 4 at 135. It further states that "[p]ast performance on contracts that are more technically relevant to the PWS requirements and similar in size, scope, and complexity will receive greater consideration than performance on contracts that are less relevant." Id. at 136. Under this explicit standard, the credit awarded for a past performance example increases on the basis of its similarity to the PWS contained in the Solicitation. Harmonia could not be surprised that—in assessing performance risk—the agency would give added weight to a past performance example for which an offeror was involved in performing essentially the same work as the work set forth in the PWS. In short, the basis for evaluating the proposal cannot reasonably be characterized as "significantly different" from the criteria the agency disclosed in the Solicitation. Wellpoint, 144 Fed. Cl. at 404.

In its reply, Harmonia emphasizes that the Solicitation is a commercial items procurement and that the "MARS and LMPRS systems were designed to use commercial software." Pl. Harmonia Holdings Grp., LLC's Reply in Supp. of its MJAR ("Pl.'s Reply") at 1–2, ECF No. 23 (citing to AR Tab 4 at 76–77). It further notes that the Relevant Experience factor required offerors to demonstrate that they had experience with the off-the-shelf software and databases USDA employs. Id. at 2 (citing AR Tab 4 at 132). In addition, Harmonia observes, the agency had "provided offerors with a detailed system and process overview and design document." Id. (citing AR Tab 4a at 140–178, 179–208). It asserts that "[t]o read the past performance section to include AMS-specific experience would circumvent the purpose of providing such extensive information—to maximize competition." Id.

The Court does not find these observations persuasive or relevant to the question before it. The allegedly unstated criterion Harmonia challenges was used to evaluate Harmonia's past performance, not its relevant experience. In addition, the Court does not understand why Harmonia finds it anomalous that the agency would favor an offeror that not only had experience with the off-the-shelf software used in the MARS and LMPRS systems, but also a record of solid performance servicing them for the particular uses to which they were put in Market News. As the record reveals, the agency considered Harmonia's "lack of any proven and established Market News experience" an "enormous risk factor" in light of the applicable congressional mandates and Market News's impact on pricing market commodities. AR 859. For this reason and those set forth above, the Court finds unavailing Harmonia's claim that the award decision must be set aside because it was based on an unstated evaluation criterion.

      **B.**    **Harmonia's Challenge to the Agency's Assignment of a Weakness Because it Did not Provide Sufficient Assurances that Incumbent Employees Would Join its Team**

Harmonia challenges the agency's decision to assign its proposal a weakness/risk under the Technical Capability factor because Harmonia failed to provide "assurances" that incumbent employees, including those in key personnel positions, would join a new Harmonia team. AR Tab 18 at 875. The agency identified this failure as a weakness because it created a risk of the loss of ten years of institutional knowledge servicing the Market News systems. Id.; Pl.'s MJAR at 14 (quoting id.).

Harmonia contends that "it isn't true that Harmonia provided no assurances that it would be able to hire incumbent personnel." Pl.'s MJAR at 14. But in the Court's view, the agency's

assessment is based on a reasonable reading of the proposal. In it, Harmonia states that based on its understanding of the work to be performed and competitive salary information it had "developed targeted staffing that ensures that [its] pricing is well-aligned for incumbent capture." AR Tab 16b at 635. At the same time, Harmonia explained that "[t]o mitigate the risk of incumbents not joining, [it had] identified candidates for each position, several of whom already have current USDA badges/clearance." Id.

The proposal also explained that Harmonia understood "that a transition is a stressful period for incumbent resources because they are forced to consider different employment," and that to alleviate the stress, Harmonia would hold "happy hours" and "meet-and-greets" with its executive leadership. Id. It represented that it would "provide a detailed introduction to Harmonia, including [its] benefits, processes, and corporate culture," and that it would "answer any questions the incumbent resources might have and work collaboratively with the outgoing contractor to facilitate a respectful and seamless transition of resources." Id. Harmonia's stated goal was to "establish a complete team as soon as possible" and to ensure "knowledge transfer" by "shadowing . . . incumbent resources who will not be joining [its] team, joint artifact reviews, question and answer sessions, etc." Id.

While Harmonia is of the view that its proposal provided adequate assurances that incumbent employees would stay on if Harmonia were awarded the contract, the agency reasonably believed otherwise. In fact, the proposal reveals that Harmonia itself thought it necessary to mitigate the risk that they would not stay by identifying other candidates for the positions, including some who were already cleared for access to the worksite. Harmonia also proposed to mitigate the risk by holding events to persuade incumbent employees not to seek alternative employment, which it noted they are "forced to consider" during what Harmonia characterizes as the "stressful period" of transition. Id.

In its reply, Harmonia argues for the first time that the Solicitation did not identify "incumbent capture" as an evaluation criterion, and that incumbent capture is in any event irrelevant to "a commercial items procurement for operations and maintenance using commercial software on a commercial system." Pl.'s Reply at 3. But Harmonia cannot reasonably feign surprise at the agency's evaluation of the extent to which incumbent employees were likely to stay on in the event that it landed the contract, where the proposal itself contained measures intended to mitigate the risk of their departure. And the Court finds unpersuasive Harmonia's suggestion that it was unreasonable for the agency to be concerned about keeping incumbents on simply because the contract involved servicing commercial software.

In short, the agency's decision to assess a weakness based on Harmonia's failure to supply sufficient assurances of continuity in personnel in its proposal was not unreasonable. Further, the argument that doing so resulted in the application of an unstated evaluation criterion cannot be squared with Harmonia's proposal itself which reflects an understanding that such continuity was relevant to the agency's evaluation of its technical capability. Harmonia's challenge based on this assignment of a weakness lacks merit.

### C. Harmonia's Argument that it Was Unreasonable for the Agency to Not Assign Strengths to Harmonia's Proposal

Harmonia also argues that it was arbitrary and unreasonable for the agency to not assign its proposal eight additional strengths under the Technical Capability factor because it included several technologies and processes that Harmonia asserts represent "the bleeding edge of software development." Pl.'s MJAR at 15. This argument is not persuasive.

Judgments on the relative merits of a technical proposal, including the assignment of strengths and weaknesses, lie particularly within the discretion of the procuring agency. See E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996) (holding that protests concerning "the minutiae of the procurement process in such matters as technical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess") (citations omitted). Judicial review of such assessments is very narrow because the "evaluations of proposals for their technical quality involve the specialized expertise of an agency's subject-matter experts." RX Joint Venture, LLC v. United States, 145 Fed. Cl. 207, 213 (2019). The Court must afford an agency great deference in its review of the agency's technical evaluations "because of the highly specialized, detailed, and discretionary analyses" conducted by agency officials. CSC Gov't Sols., LLC v. United States, 129 Fed. Cl. 416, 434 (2016) (citations omitted); see also Tech. Innovation All. LLC v. United States, 149 Fed. Cl. 105, 129 (2020) ("The Court's scope of review is particularly narrow when it comes to agency judgments regarding the technical merits of particular proposals."); Benchmade Knife Co. v. United States, 79 Fed. Cl. 731, 740 (2007) (holding that "[a]gencies are entitled to considerable discretion and deference in matters requiring exercise of technical judgment").

Further, the Court notes that the agency assigned Harmonia's proposal a strength under the Technical Capability factor on the grounds that it was "[e]xcellent overall," and another because it was a "high quality proposal with little or no material weaknesses." AR Tab 18 at 850. Thus, so far as the Court can tell, there is no reason to believe that the agency did not give consideration to the allegedly "bleeding edge" innovations in Harmonia's proposal, even if it did not choose to identify each such innovation as a separate strength of the proposal. Pl.'s MJAR at 15. Harmonia's contention that its proposal should have been assigned additional strengths is therefore without merit.

### D. Harmonia's Argument that the SSA Failed to Exercise Her Independent Judgement or Document Her Rationale in Making the Best-Value Tradeoff

Finally, Harmonia alleges that the SSA did not exercise independent judgment in conducting her best-value tradeoff analysis and that she did not provide adequate documentation of her reasoning. These contentions are also meritless.

First, Harmonia observes that "[d]espite noting her 'concerns' with the [TEP's] evaluation of Digital Management's proposal, and reducing those ratings, [the SSA] gave Digital Management the exact same score the [TEP] did." Pl.'s MJAR at 18. This argument falls flat because it is premised on a misreading of the record. In her Best Value Determination, the SSA observed that when she met with the TEP in July of 2020, she had "a concern regarding the DMI proposal and ratings by the TEP." AR Tab 19 at 867. Specifically, she had initially rated DMI lower than had the TEP in "some areas" because of language (presumably in DMI's proposal)

stating that DMI would "continue to" take certain actions. Id. As she explained in her Best Value Determination, she was "not familiar with . . . DMI's current processes, [and she] didn't know what [DMI] meant by 'DMI will continue to.'" Id. That question was answered to her satisfaction during a meeting she held with the TEP on July 14, 2020. Id. As she explains, during that meeting, the TEP members advised her of their familiarity with DMI's work on LMPRS and MARS and their confidence in the ratings they provided. Id.

In short, the SSA's expression of "concern" that she referenced in the Best Value Determination is not inconsistent with her decision not to lower DMI's scores. Id. Nor does it show some lack of independent judgment on her part. Instead, it reveals the opposite, i.e., that the SSA conducted her own independent evaluation of the proposal, that she asked the TEP to provide her with clarification of DMI's proposal, and that, upon receiving such clarification she was satisfied that no reduction in the scores was warranted.

The Court notes that at oral argument counsel advanced for the first time a somewhat different but similarly unpersuasive attack on the sufficiency of the SSA's decision. He contended that the tables of strengths and weaknesses included in the SSA's decision reflect fewer strengths for DMI than the tables contained in the TEP Report. He argued that the SSA's decision is unreasonable because she did not explain why she assigned DMI fewer strengths or why, given that she had done so, she did not also downgrade DMI's overall score. Oral Arg. at 15:35–16:03.

The Court rejects the basic premise of this argument, which is that the SSA assigned fewer strengths to DMI's proposal than the TEP did or that she found invalid any of the strengths that the TEP identified. To be sure, the tables in the two reports do not track each other because the SSA's table does not contain an enumeration of each strength that the TEP set forth in its tables under the Relevant Experience and Past Performance factors. Compare AR Tab 18 at 842–45 (TEP Report), with AR Tab 19 868–70 (SSA's Best Value Determination). Instead, under the "strengths" column, the SSA's table contains a summary characterization of DMI's relevant experience as "[e]xcellent overall." AR Tab 19 at 870. It also notes that most of the ratings assigned by the TEP members under the Past Performance factor were either "satisfactory" or "substantial confidence." Id. The Court does not read the difference in format as reflecting any substantive disagreement with the TEP's assessment of the strengths of DMI's proposal, especially because the decision document elsewhere includes a lengthy narrative describing strengths of DMI's proposal that do not appear in her table. Id. at 882–85.

Further, even if the number or types of strengths that the SSA identified were not identical to those the TEP identified, that would not necessarily require DMI's proposal to receive a lower score. The scores were determined on the basis of the adjectival ratings the TEP members gave to DMI's proposal under the Technical Evaluation Plan. See AR Tab 3 at 23. There is no provision in the Solicitation or the Plan that makes the adjectival ratings dependent on the number of strengths or weaknesses assigned to a proposal. The new argument counsel raised at oral argument therefore lacks merit.

Finally, Harmonia contends that the SSA's tradeoff decision was not adequately documented. It argues that she "merely parroted back a list of strengths, then concluded those strengths were worth the premium." Pl.'s MJAR at 19. It complains that the SSA did not discuss

13

any of Harmonia's technical strengths nor what it was about DMI's technical strengths that made them superior to Harmonia's. Id. at 18.

This argument is based on another mischaracterization of the SSA's decision. To be sure, as described above, her decision incorporates tables summarizing the strengths and weaknesses of all of the proposals that the TEP evaluated. And it does contain several pages enumerating DMI's strengths, but no similar discussion of Harmonia's. Nonetheless, it is clear that both the TEP and the SSA did more than "parrot back" DMI's strengths. Pl.'s MJAR at 18 (citations omitted). It is also clear that the SSA took the strengths of Harmonia's proposal into consideration even if she did not enumerate them in the narrative. In fact, the SSA explicitly recognized the "overall" excellence of Harmonia's technical capability and relevant experience. AR Tab 19 at 875. Moreover, Harmonia's final technical rating was only slightly lower than DMI's. Id. at 880.

The SSA acknowledged, in fact, that "Harmonia's proposal was very good and their price was approximately 11% lower than DMI's." Id. at 885. Nonetheless, she explained, DMI's proposal presented the best value to the government, not because of the number of strengths it had been assigned, but because of DMI's "institutional knowledge," incumbent "key personnel," "established development environments for LMPRS and MARS," and "established knowledge and experience" with the National Information Technical Center, where the MARS and LMPRS were currently hosted. Id. Harmonia, on the other hand, had no Market News experience and would have to overcome a "learning curve to become familiar with the LMPRS and MARS environment and functionality." Id. It is for these reasons, documented in her decision, that the SSA reasonably concluded that DMI's proposal represented the best value to the government.

## CONCLUSION

On the basis of the foregoing, Harmonia's motion for judgment on the administrative record is **DENIED**. ECF No. 21. The government's motion is **GRANTED**. ECF No. 22. The Clerk is directed to enter judgment accordingly. Each side shall bear its own costs.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Chief Judge